*If this opinion indicates that it is "FOR PUBLICATION," it is subject to
revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

JOHN MATTHEW WAGNER,

        Defendant-Appellant.

UNPUBLISHED
April 16, 2020

No. 346404
Macomb Circuit Court
LC No. 2017-002325-FH

Before: SAWYER, P.J., and LETICA and REDFORD, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of assault with intent to do great bodily harm less than murder, MCL 750.84, and unarmed robbery, MCL 750.530. The trial court sentenced defendant as a third-offense habitual offender, MCL 769.11, to 160 to 240 months' imprisonment for assault with intent to do great bodily harm, and to 171 to 360 months' imprisonment for unarmed robbery. We affirm.

## I. BACKGROUND

This case arises from injuries sustained by Julio Cesar Leyva-Nino from defendant's conduct at their friend, Joseph Serra's home. Julio, Donny Locke, Sierra Stacey and defendant spent an afternoon at Serra's house swimming. Serra and his neighbor, Sal Napoltano, were also present. After defendant, Julio, Locke, and Stacey changed into dry clothes and prepared to leave, Julio gave defendant who had his phone in his pocket, "a shove or . . . a slight tackle" into the pool. Defendant became angry and screamed that Julio needed to replace his phone. Julio apologized to defendant and attempted to give defendant $60 or $70 despite having around $700 to $1000 cash in his wallet. Witnesses recalled differently Julio's conduct but they testified that defendant flipped Julio onto the ground, straddling him, punched him in the face a few times, and then stomped Julio's head.

Hours after the incident someone dropped Julio at the hospital emergency room where neurosurgeon Dr. Richard Veyna examined and treated him for a skull fracture and brain injury. Dr. Veyna testified that the back of Julio's skull fractured, his brain hit the front of his skull, shifted significantly, and hemorrhaged in a life-threatening manner. Dr. Veyna performed emergency

surgery. Because of the injuries he sustained from the incident, Julio required physical, occupational, and speech therapy and suffers from ongoing memory loss.

The day after the incident, Detective Christopher Delor recovered Julio's empty wallet. When arrested, defendant had $938 in cash. Detective Delor interrogated defendant after reading him his *Miranda*[1] rights and upon defendant's affirmation that he understood his rights. Defendant denied that he kicked, punched, or intentionally hurt Julio. Defendant admitted that he took "a couple hundred" bucks that had fallen on the ground. The jury convicted defendant of the charged offenses. Defendant now appeals.

## II. ANALYSES

Defendant argues that 1) the prosecution failed to produce sufficient evidence to convict him of both charged offenses; 2) the trial court erred by admitting the recorded video of his statements made during his custodial interrogation on the ground that he involuntarily waived his *Miranda* rights; and 3) his trial counsel provided ineffective assistance by failing to convey a plea deal to defendant and for failing to move to suppress the statements made in the interrogation video. We disagree regarding all claims of error.

## A. SUFFICIENCY OF THE EVIDENCE

Defendant first argues that the prosecution failed to produce sufficient evidence of defendant's intent to do great bodily harm. In support of his claim of error, defendant asserts that the assault lasted a short duration, and no one present at the scene, including Julio himself, believed that Julio needed medical attention. Further, he relies on Dr. Julie Burnham's opinion testimony that Julio's medical records were inconsistent with Serra's and Napoltano's accounts of the assault, and that Julio's brain injury could have been caused by a slip and fall. He contends that Dr. Veyna's testimony to the contrary was based on observations made when Julio's condition had worsened because of his own failure to seek treatment.

We review de novo whether the prosecution presented sufficient evidence to convict defendant. *People v Harverson*, 291 Mich App 171, 175-176; 804 NW2d 757 (2010). We review the evidence "in a light most favorable to the prosecutor to determine whether any trier of fact could find the essential elements of the crime were proven beyond a reasonable doubt." *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012) (quotation marks and citation omitted). "Questions regarding the weight of the evidence and credibility of witnesses are for the jury, and this Court must not interfere with that role even when reviewing the sufficiency of the evidence." *People v Carll*, 322 Mich App 690, 696; 915 NW2d 387 (2018) (citation omitted). "[A] reviewing court is required to draw all reasonable inferences and make credibility choices in support of the jury verdict." *Id.* (citation omitted).

"The elements of assault with intent to do great bodily harm less than murder are: (1) an attempt or threat with force or violence to do corporal harm to another (an assault), and (2) an intent to do great bodily harm *less than murder*." *People v Brown*, 267 Mich App 141, 147; 703

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

NW2d 230 (2005) (quotation marks and citations omitted, emphasis in original). "This Court has defined the intent to do great bodily harm as an intent to do serious injury of an aggravated nature." *Id.* (quotation marks and citations omitted).

> Because of the difficulty in proving an actor's intent, only minimal circumstantial evidence is necessary to show that a defendant had the requisite intent. Intent to cause serious harm can be inferred from the defendant's actions, including the use of a dangerous weapon or the making of threats. Although actual injury to the victim is not an element of the crime, injuries suffered by the victim may also be indicative of a defendant's intent. [*People v Stevens*, 306 Mich App 620, 629; 858 NW2d 98 (2014) (citations omitted).]

Defendant essentially argues that the prosecution failed to invalidate his theory that he accidentally "fell on top" of Julio in the course of an insignificant scuffle. The prosecution, however, "is bound to prove the elements of the crime beyond a reasonable doubt," and "is not obligated to disprove every reasonable theory consistent with innocence to discharge its responsibility; it need only convince the jury in the face of whatever contradictory evidence the defendant may provide." *People v Nowack*, 462 Mich 392, 400; 614 NW2d 78 (2000) (quotation marks and citation omitted).

At trial, Serra testified that he "will never forget" the sound of Julio's head hitting the cement when defendant "flipped [Julio] onto his back." According to Serra, Julio was "thrown," he did not "trip" or "fall" or "get his legs tangled up." Defendant, still "screaming," "got over the top of [Julio]" and punched him "a few" times "in the right side of his head, his face." Defendant then "curb stomp[ed]" Julio—he "raised [his shoe] high and slammed it down onto [Julio's] face." Serra "didn't want to go near [defendant]" because "[t]he look in his eyes was that he wanted to kill." Serra's testimony alone sufficed to establish defendant's intent to do serious injury of an aggravated nature.

Napoltano's testimony, while differing from Serra's on some details, also independently sufficed to establish defendant's intent to do great bodily harm. Napoltano disagreed with Serra that Julio's head hit the cement "on the initial flip." He heard Julio's head hit the cement when defendant stomped, not when defendant "flipped" Julio. Napoltano testified that defendant stomped on Julio's head with "a hard stomp," not "a little kick"—defendant had "his knee up [to his] chest area" before bringing his foot down on Julio's head.

The nature of Julio's injuries also served as evidence of defendant's intent to do great bodily harm. *Stevens*, 306 Mich App at 629. Dr. Veyna testified regarding Julio's severe skull and brain injury caused by trauma associated with his skull "hitting the pavement so hard, so it was a pretty traumatic blunt force to the brain." Julio's CT scan showed that his brain had swollen and shifted 13.6 millimeters. According to Dr. Veyna, a 13.6-millimeter shift is "big trouble" and "life-threatening." Dr. Veyna opined, based upon his 20 years of experience as a neurosurgeon, that such a severe injury would not be caused by "just a slip and fall."

Although Dr. Burnham offered opinion testimony that differed from Dr. Veyna, the jury was charged with deciding the weight such testimony deserved in light of the evidence presented at trial. The record reflects that Dr. Burnham admitted that there was no testimony indicating that

defendant's stomp hit Julio's nose, as she had assumed. She agreed that the bone under Julio's eye would not necessarily be fractured by two or three punches. She also admitted that she based her opinion, that neck injuries should have been present, on her erroneous belief that defendant had placed his knee on Julio's throat rather than his chest.

The possibility that Julio's delay in seeking treatment might have exacerbated his symptoms does not undermine the evidence that established that he sustained severe injuries when defendant assaulted him. Based on Serra's, Napoltano's, and Dr. Veyna's testimonies, the jury could reasonably find beyond a reasonable doubt that defendant assaulted Julio with the intent to do him great bodily harm less than murder. Therefore, the prosecution presented sufficient evidence of defendant's guilt regarding that charged offense.

Next, defendant argues that the prosecution failed to produce sufficient evidence of a robbery because Julio agreed that defendant should be compensated for his phone before the assault and no one saw defendant take Julio's wallet after the assault. We disagree.

MCL 750.530, defines unarmed robbery as follows:

> (1) A person who, in the course of committing a larceny of any money or other property that may be the subject of larceny, uses force or violence against any person who is present, or who assaults or puts the person in fear, is guilty of a felony punishable by imprisonment for not more than 15 years.

> (2) As used in this section, "in the course of committing a larceny" includes acts that occur in an attempt to commit the larceny, or during commission of the larceny, or in flight or attempted flight after the commission of the larceny, or in an attempt to retain possession of the property.

In *Harverson*, 291 Mich App at 177-178 (citations omitted), this Court summarized:

> To be guilty of unarmed robbery, a defendant must (1) feloniously take the property of another, (2) by force or violence or assault or putting in fear, and (3) be unarmed. Unarmed robbery is a specific intent crime for which the prosecution must establish that the defendant intended to permanently deprive the owner of property. Because intent may be difficult to prove, only minimal circumstantial evidence is necessary to show a defendant entertained the requisite intent.

The elements of unarmed robbery may be satisfied "even where a defendant uses force for the first time after completing a taking." *People v Smith-Anthony*, 494 Mich 669, 686; 837 NW2d 415 (2013). The use of "force" means "nothing more than the exertion of strength or physical power." *People v Passage*, 277 Mich App 175, 178; 743 NW2d 746 (2007).

Julio testified that, on the day of the incident, he had "[b]etween $700 and $1,000" in his wallet and that he offered defendant $60 or $70 to replace his phone. According to Napoltano, Julio was "already taking money out of his wallet and throwing it on the ground" when the enraged defendant exited the pool and approached Julio. Napoltano denied that Julio made any aggressive movements or that he threw the money to mock defendant's anger. The evidence established that defendant assaulted Julio. Defendant admitted that he took the money after the assault. The

evidence established that the detective recovered Julio's empty wallet and that same day the Shelby Township Police arrested defendant who had $938 in cash.

Detective Delor asked defendant about the money during his interrogation:

> *Q*. So you're saying he took some money out of his wallet while you were arguing to pay for the phone?
>
> *A*. No. He never was gonna. Yeah, he did but it was a $50. I was like, "Dude this not enough, why are you doing this? You know my phone's worth a lot more than $50, obviously." Couple hundred dollars easy.

> * * *

> *Q*. You don't know how much money you grabbed?
>
> *A*. A couple hundred bucks, tops.

> * * *

> *Q*. When you grabbed the couple hundred bucks, that was in [Julio's] wallet?
>
> *A*. It fell it out. He had his wallet out originally to, like, pay me, and I was like "Julio, I'm taking this. You owe me. You made it a joke to throw the $50 at me."
>
> *Q*. So that couple hundred was on the ground? And [Julio] didn't throw it out, that you know of? It must have just fell out?
>
> *A*. He did not. He was not giving it to me. He wasn't offering it to me.

At trial, defendant testified that when he told Detective Delor that Julio did not give him the money, he meant "that he wasn't like giving it to me like . . . if you were going to do a financial transaction with someone . . . ." The jury could reasonably interpret defendant's statement to the detective as an admission that he intentionally took Julio's money and that he knew the money did not belong to him. The record establishes that the prosecution presented sufficient evidence from which the jury could find beyond a reasonable doubt that defendant committed unarmed robbery.

## B. WAIVER OF *MIRANDA* RIGHTS

Defendant argues that he involuntarily waived his *Miranda* rights because a police report and his presentence investigation report indicate that he used LSD and drank alcohol on the day of the incident, and because the video of his interrogation the day after the incident indicated that he appeared confused and complained that he had not eaten in five hours. Defendant's argument lacks merit.

Defendant failed to object or to move for a *Walker*[2] hearing in the trial court. See *People v Todd*, 186 Mich App 625, 628; 465 NW2d 380 (1990) ("Because the *Miranda* rule is only a procedural safeguard to protect constitutional rights, a *Miranda* argument does not implicate the "important constitutional question" exception to the preservation requirement.") Therefore, defendant failed to preserve this issue for review. This court reviews unpreserved issues for plain error. *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999). "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights. The third requirement generally requires a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. at 763.

"Statements of an accused made during custodial interrogation are inadmissible unless the accused voluntarily, knowingly, and intelligently waived his or her Fifth Amendment rights." *People v Gipson*, 287 Mich App 261, 264-265; 787 NW2d 126 (2010), citing *Miranda v Arizona*, 384 US 436, 444; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

> Whether a waiver of *Miranda* rights is voluntary depends on the absence of police coercion. A waiver is voluntary if it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. The voluntariness of a defendant's statements is determined by examining the totality of the circumstances surrounding the interrogation. A court should consider factors such as: the duration of the defendant's detention and questioning; the age, education, intelligence, and experience of the defendant; whether there was unnecessary delay of the arraignment; the defendant's mental and physical state; whether the defendant was threatened or abused; and any promises of leniency.

> Whether a waiver was made knowingly and intelligently requires an inquiry into defendants level of understanding, irrespective of police conduct. A defendant does not need to understand the consequences and ramifications of waiving his or her rights. A very basic understanding of those rights is all that is necessary. Intoxication from alcohol or other substances can affect the validity of a waiver, but is not dispositive. [*Id*. at 264-265 (quotation marks, citations, and alteration omitted.]

Defendant seeks to rely on a police report and his presentence investigation report that were not introduced or admitted at trial. "However, to consider evidence presented on appeal that the parties failed to present to the trial court would be an impermissible expansion of the lower court record." *People v Morrison*, ___ Mich App ___, ___; ___ NW2d ___ (2019) (Docket No. 344531), slip op at 4, citing MCR 7.210(A)(1).

Defendant also argues that he appeared intoxicated and confused in the video of his interrogation which indicates he did not validly waive his *Miranda* rights. That contention is unsupported by the record. The video shows that Detective Delor behaved appropriately throughout defendant's interrogation. He read defendant his *Miranda* rights and asked defendant

---

[2] *People v Walker (On Rehearing)*, 374 Mich 331; 132 NW2d 87 (1965).

if he understood them. Defendant first responded, "I'm not being detained, am I?" Detective Delor explained that defendant was under arrest for assault and asked again, "I just read you your rights; do you understand your rights?" Defendant responded, "Yeah." At the beginning of the interrogation defendant claimed that he was not at Serra's house on the day of the incident. Detective Delor inquired further without aggressive or coercive conduct or statements to defendant. In fact, the video reflects that the detective sought to make defendant comfortable. During the recorded video, defendant hung his head, placed his hands on his forehead, and paused on occasion for an extended period. One time, defendant declared that the detective had no proof to which Detective Delor replied that proof included eyewitnesses. After pausing, defendant voluntarily engaged in conversation with the detective. Another time, after similarly pausing, defendant looked up and began to explain his version of events. He spoke rapidly causing some slurring but he ably communicated not unlike at trial, during which defense counsel frequently implored him to "stop mumbling." The record does not reflect that during the interview defendant suffered from disability associated with intoxication by drugs or alcohol.

Even if defendant were intoxicated and hungry during his interrogation, those factors alone would not be sufficient to establish that he involuntarily waived his *Miranda* rights. In *Gipson*, the defendant testified that he had ingested four 40-ounce beers, 25 Vicodin pills, and smoked 12 joints in the 24 hours before his interrogation. *Id*. at 265. The police interviewers testified that the defendant communicated effectively and did not appear to be under the influence of drugs and alcohol. *Id*. at 266. This Court held that the trial court did not err in denying the defendant's motion to suppress his statements because "he was in his mid-20s, had a GED, had some limited prior contact with the police, was interviewed within a short time after being taken into custody, and . . . his interviews, which were about three hours apart, lasted approximately an hour each." *Id*. at 266. The trial court was not required to credit the defendant's testimony that he was intoxicated over the interviewers' testimony that he was not. *Id*.

In this case, defendant initially testified that he "spent hours in jail with no food" before his interrogation. He later admitted that he was arrested at 11:00 a.m. and interrogated at 2:00 p.m. Defendant also admitted that he had been convicted of a felony in the past, so the interrogation was not his first interaction with police. Defendant was 28 years old at the time of trial, and there is no indication on the record that he suffers from any cognitive deficit. The video does not indicate that defendant suffered from inebriation that limited or interfered with his ability to rationally decide to waive his *Miranda* rights and talk with the police. Review of the totality of the circumstances in this case does not support defendant's contention that he involuntarily waived his *Miranda* rights because of intoxication, hunger, or coercion. The record indicates that defendant voluntarily, knowingly, and intelligently waived his *Miranda* rights. Therefore, defendant has failed to establish that the trial court erred. Moreover, the record reflects that, even if the trial court erred, defendant cannot establish that he suffered prejudice, i.e., that the error affected the outcome of the lower court proceedings. The prosecution presented substantial evidence other than the video evidence from which reasonable jurors could find beyond a reasonable doubt defendant's guilt on the charged offenses. Accordingly, defendant is not entitled to any relief in this regard.

## C.  INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant argues that his trial counsel provided ineffective assistance by failing to communicate a plea offer to defendant and because he failed to file a motion to suppress defendant's statements to the police contained in the video of his interrogation.  We disagree.

Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel.  *People v Vaughn*, 491 Mich 642, 669-670; 821 NW2d 288 (2012).  "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law." *People v Matuszak*, 263 Mich App 42, 48; 687 NW2d 342 (2004).  Findings of fact "are reviewed for clear error," while "constitutional determinations are reviewed de novo."  *Id*.  A finding is clearly erroneous if this Court is "left with a definite and firm conviction that a mistake was made." *Gipson*, 287 Mich App at 264.

In *People v Trakhtenberg*, 493 Mich 38, 51; 826 NW2d 136 (2012) (citations omitted), our Supreme Court explained that, to obtain a new trial on the ground that defense counsel provided ineffective assistance, a defendant "must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different."  Defendant "must overcome the strong presumption that counsel's performance was born from a sound trial strategy."  *Id*. at 52 (citation omitted).  This standard requires a reviewing court "to affirmatively entertain the range of possible 'reasons  . . . counsel may have had for proceeding as they did.' " *Vaughn*, 491 Mich at 670, quoting *Cullen v Pinholster*, 563 US 170, 196; 131 S Ct 1388; 179 L Ed 2d 557 (2011). "This Court will not substitute its judgment for that of counsel regarding matters of trial strategy, nor will it assess counsel's competence with the benefit of hindsight."  *People v Rockey*, 237 Mich App 74, 76-77; 601 NW2d 887 (1999) (citation omitted).

"[A]s a general rule, defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Missouri v Frye*, 566 US 134, 145; 132 S Ct 1399; 182 L Ed 2d 379 (2012).  "When defense counsel allow[s] the offer to expire without advising the defendant or allowing him to consider it, defense counsel [does] not render the effective assistance the Constitution requires."  *Id*.  "To show prejudice from ineffective assistance of counsel where a plea offer has lapsed or been rejected because of counsel's deficient performance, defendants must demonstrate a reasonable probability they would have accepted the earlier plea offer" and "also demonstrate a reasonable probability the plea would have been entered without the prosecution canceling it or the trial court refusing to accept it, if they had the authority to exercise that discretion under state law."  *Id*. at 147.  A defendant, however, has no right to be offered a plea.  *Id*. at 148.

In Michigan, a trial counsel's assistance must enable "the defendant to make an informed and voluntary choice between trial and a guilty plea."  *People v Corteway*, 212 Mich App 442, 446; 538 NW2d 60 (1995).  Although a claim of ineffective assistance of counsel may be based on counsel's failure to communicate a plea offer, defendant must prove by a preponderance of the evidence that a plea offer was made and that his counsel failed to communicate to him.  *People v Williams*, 171 Mich App 234, 242; 429 NW2d 649 (1988).  "Because the defendant bears the burden of demonstrating both deficient performance and prejudice, the defendant necessarily bears

the burden of establishing the factual predicate for his claim." *People v Carbin*, 463 Mich 590, 600; 623 NW2d 884 (2001).

Defendant argues that his trial counsel provided him ineffective assistance on the ground that he did not want to go to trial and desired a plea agreement but his counsel told him that plea deals were not offered to prior felons which he contends cannot be accurate. Defendant does not identify an actual plea offer that the prosecution made that defense counsel failed to communicate. The trial court record contains no evidence that the prosecution ever extended a plea offer to defendant, that defense counsel failed to convey a plea offer, or that defense counsel performed deficiently in any other manner regarding plea negotiations. Therefore, defendant has failed to establish by a preponderance the necessary factual predicate for this claim that his trial counsel provided him ineffective assistance of counsel.

Defendant also argues that his trial counsel provided ineffective assistance by failing to move to suppress defendant's statements to the police contained in the interrogation video. As stated earlier, there is no reasonable basis on which to conclude that defendant involuntarily made his statements to the police. "Obviously, defense counsel is not required to make frivolous or meritless motions or objections." *People v Knapp*, 244 Mich App 361, 386; 624 NW2d 227 (2001).

Further, the record reflects that defendant's trial counsel did not object to the admission of the interrogation video based upon a reasonable trial strategy. He stipulated to the admission of the video and used its contents as part of the defense. During his closing argument, trial counsel referred to the interrogation multiple times to bolster defendant's credibility, emphasize the consistency of his statements to the detective with his trial testimony, and instill in the jurors' minds that defendant lacked the requisite intent to commit the charged offenses. Defendant's trial counsel argued to the jury: "Even in his interview with the detective, [defendant] asked the detective if Julio was okay. [Defendant] never called Julio a liar, not once." He argued that the prosecution minimized how statements defendant made in his interview were consistent with his testimony at trial. Regarding the unarmed robbery charge, defense counsel argued:

> [Defendant] explained in his interview, you know, he told the detective [Julio] wasn't offering or giving [him the money]. So, [defendant] interpreted that as not offering or giving it to him in that way, but it was a disrespectful way of just sort of belittling him or, you know, demeaning him; here you go, here's your money, stuff like that. That's what [Julio] did.

Respecting both claims of ineffective assistance, defendant has failed to establish that his trial counsel's performance fell below an objective standard of reasonableness or that but for his counsel's performance the outcome of his trial would have been different. Therefore, defendant has not established that defense counsel provided ineffective assistance.

Affirmed.

/s/ David H. Sawyer
/s/ Anica Letica
/s/ James Robert Redford